EOD
10/27/2009

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **RUTH ANN GAMBLE-LEDBETTER** | § | Case No. 07-42635 |
| xxx-xx-8364 | § | |
| | § | |
| Debtor | § | Chapter 7 |

| | | |
|---|---|---|
| RUTH ANN GAMBLE-LEDBETTER | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Adversary No. 08-4031 |
| | § | |
| ANDRA GROUP, L. P. | § | |
| | § | |
| Defendant | § | |

| | | |
|---|---|---|
| ANDRA GROUP, L. P. | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Adversary No. 08-4033 |
| | § | |
| RUTH ANN GAMBLE-LEDBETTER | § | |
| | § | |
| Defendant | § | |

## MEMORANDUM OF DECISION

This matter came before the Court as a result of a consolidated trial of the complaint of the Creditor-Plaintiff, Andra Group, L.P. f/k/a Andra Group, Inc. ("Plaintiff" or "Andra") asserted in adversary proceeding no. 08-4033, through which it seeks to deny the entry of a Chapter 7 discharge in favor of the Defendant-Debtor, Ruth Ann Gamble-Ledbetter ("Debtor"), pursuant to 11 U.S.C. §727(a)(4)(A) or, alternatively,

seeks a determination of whether an alleged debt allegedly owed to it by the Defendant-Debtor is excepted from discharge pursuant to 11 U.S.C. §523(a)(2)(A), (a)(4) or (a)(6). Consolidated for trial with that complaint is the contested matter arising from the Andra Group's objection to the Debtor's claim of an absolute exemption of her homestead and as to a particular life insurance policy in which the Plaintiff claims an interest. The Court also consolidated for trial purposes the Debtor's complaint to avoid what she characterizes as a "judgment lien" held by Andra as a result of certain state court litigation between the parties and to nullify the filing of a lis pendens designation arising from that litigation. At the conclusion of the consolidated trial, the Court took all matters under advisement. The following memorandum of decision disposes of all issues before the Court.[1]

## Factual and Procedural Background

The Plaintiff, Andra Group, L.P., is an internet-based woman's lingerie sales company founded by Tomima Edmark. Ms. Edmark first hired the Debtor-Defendant, Ruth Ann Gamble-Ledbetter, as a bookkeeper for her business in 2000.[2] Though generally successful in that first stint, Ms. Ledbetter voluntarily departed in early 2002.

---

[1] This Court has jurisdiction to consider the competing complaints and the objection to exemption pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157(a). The Court has authority to enter a final judgment in these two adversary proceedings since they constitute a core proceeding under either 28 U.S.C. §157(b)(2)(A), (I), (J) and (K). The Court has the authority to enter a final order in the contested matter regarding the objection to exemptions since it constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(A) and (B).

[2] Its predecessor, Topsy Tail, Inc., also engaged in the production and sale of a certain hairstyling product for women for which the company was initially named.

Approximately six months later, Andra regained her services by hiring her company, Second Office, Inc., as an independent contractor to provide bookkeeping services. Despite the incorporation of her business, Ms. Ledbetter was the primary individual through which Second Office provided the bookkeeping services to Andra. She had primary responsibility for tracking all of the company's financial activities, including account payables and receivables, through the use of an all-purpose business accounting software program known as Peachtree. She reported directly to Ms. Edmark and to the company's outside accountant, David Joiner. Ms. Ledbetter had control of the Andra check inventory, although sole signatory authority on Andra's checking account was retained by Ms. Edmark. Ms. Ledbetter would produce through the Peachtree system all of the checks needed for ongoing operations and present them to Ms. Edmark for execution once per week and generally handle all activities regarding the check register.[3]

The relationship continued from 2001 to 2005 without incident and seemingly to the mutual benefit of both parties. Andra and its outside accountant were apparently pleased with Ledbetter's work. Andra paid almost $238,000 to Second Office in legitimate bookkeeping billings from 2001 to 2005, highlighted by invoices totaling $80,295.60 in calendar year 2004.[4] Ledbetter seemed satisfied as well — almost to a fault — by failing to ever ask for an increase of her company's $25 per hour rate billed to Andra throughout the four+-year period.

---

[3] Plaintiff's Exhibits, Vol. II.

[4] Plaintiff's Exhibits. Vol I., Ex. 13.

The peace was soon disrupted; however, when in July 2005 an employee at Andra's credit union discovered an $11,580.83 negotiated check with a signature suspiciously different from that of Ms. Edmark.[5] An initial inquiry into Andra's accounting books revealed the vendor-payee as recorded in the check registry (Le Mystere) did not match the endorsements on the check. Instead of reflecting a negotiation by Le Mystere, the check reflected that it was first negotiated and deposited into the checking account of Second Office and subsequently a corresponding deposit was made into Ms. Ledbetter's personal bank account. Upon consultation with Andra's accountant, Ms. Edmark identified four or five more suspicious checks. The accountant subsequently discovered through the internal auditing log of the Peachtree accounting system that, as to the original La Mystere check, a Peachtree user initialed "RAGL" had initially prepared a checking transaction with La Mystere as payee, changed the payee to Second Office for check printing purposes, then changed it back so that the ledger would reflect the payee of the check as La Mystere.[6]

When confronted, Ms. Ledbetter quickly took responsibility for the bookkeeping error but denied any wrongdoing. She denied having any knowledge regarding the alleged deposits or the tampering with the check register. She never claimed at that time that the payment could be the product of a legitimate expense reimbursement process to

---

[5] Check #10709 located on next to last page of Plaintiff's Ex. Vol. IV.

[6] Plaintiff's Exhibits Vol. II at first tab. When the accountant sought to use the same internal auditing feature of Peachtree in the investigation of other suspicious checks, he discovered that the auditing feature had been deactivated.

her or her company. Despite her promises of cooperation, Ms. Ledbetter quickly submitted her company's resignation as the bookkeeper for Andra soon after her meeting with Ms. Edmark and David Joiner. Upon Andra's payment of the final invoice submitted by Second Office and the return of Andra records from Second Office's headquarters in Lewisville, Ms. Ledbetter refused to provide further cooperation into the investigation regarding the apparent misappropriation of Andra funds.

The results of that investigation subsequently revealed that funds in excess of $900,000 had been misappropriated from Andra over the 4½ years in which Ms. Ledbetter's company had acted as Andra's bookkeeper through a methodology similar to those used to disguise the so-called La Mystere payment.[7] Virtually all of the transactions were registered as vendor payments based upon a nonexistent vendor invoice, processed through checks that contained a forged signature of Tomima Edmark,[8] and resulted in a corresponding deposit of equivalent proceeds into a bank account owned by Ms. Ledbetter or the negotiation of the Andra check to a third party for the benefit of Ms. Ledbetter. Not one of the questionable transactions reflected a legitimate company expense.

In the same time period, the subpoenaed bank records of the Defendant reveal substantial activity that was significantly funded by the deposits procured from Andra.

---

[7] The approximate amount of misappropriations calculated on an annual basis were as follows: 2001: $103,000; 2002: $135,000; 2003: $302,000; 2004: $235,000; and 2005: $150,000.

[8] Plaintiff's Exhibits vols. III and IV, summarized in Plaintiff's Ex. 12.

Such deposits were commingled with other personal funds of the Debtor. The records of those commingled accounts evidenced withdrawals in excess of $500 (which was the threshold for which the Debtor's former bank would produce banking records to the Plaintiff) that totaled more than $264,000 in the relevant time period.[9] The subpoenaed records reveal that the Defendant paid personal American Express charges in excess of $119,000.[10] She had other online transfers of cash from her accounts exceeding $102,000.[11] She incurred and paid charges exceeding $53,000 for home improvements and landscaping.[12] More than $54,000 of her mortgage debt was satisfied.[13] Needless to say, the aggregate amount of bank activity and the cash flowing through her accounts seems highly unusual for an individual otherwise reporting an average annual income of between $35,000 and $40,000 per year.[14]

These subsequent discoveries led the Plaintiff to initiate civil litigation against the Defendant in late 2005 before the 193rd Judicial District Court in Dallas County and to file a lis pendens notice against the Debtor's homestead property located at 4507 N. Horseshoe Trail in The Colony.[15] At the June 2007 trial setting, the Defendant failed to

---

[9] Plaintiff's Exhibit vols. V and VI.

[10] Plaintiff's Ex. 16.

[11] Plaintiff's Ex. 15.

[12] Plaintiff's Ex. 14 at pg. 3.

[13] Plaintiff's Ex. Vol V, Ex. 15 regarding online transfers and Vol. VI regarding check payments.

[14] See Defendant's tax returns in Plaintiff's Exhibit Vol I.

[15] Defendant's Ex. BB.

appear personally, although she was represented by counsel, and she communicated to her counsel by telephone throughout the day as the parties attempted to reach a settlement. A Rule 11 settlement agreement was announced on the record of the state court and the presiding judge accepted the agreement on that date.[16] When the Defendant subsequently refused to sign the proposed agreed judgment incorporating the terms of the agreement, the Plaintiff sought to compel its enforcement and entry. The Court did so and the terms of the agreement were subsequently reduced to a written judgment signed on November 8, 2007, in favor of the Plaintiff and against the Defendant and Second Office, Inc. jointly and severally, for actual damages in the amount of $400,000.00 plus 5% post-judgment interest and the Plaintiff was also awarded an equitable interest in the Defendant's homestead property to the extent of $54,036.00.[17] The Defendant insists that the agreed judgment was erroneously entered because she never agreed to its terms, notwithstanding the announcement of her attorney on the record. She failed, however, to appeal that judgment.

At 6:30 p.m. on the date that the judgment was signed, the Defendant filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. The complaints in these two adversary proceedings were filed almost simultaneously. In adversary proceeding 08-4031, the Debtor took the initiative by filing a complaint seeking to nullify and remove the lien in favor of Andra upon her homestead as imposed by the judge in the

---

[16] Plaintiff's Ex. 17.

[17] Defendant's Ex. AA.

state court lawsuit to the extent that it impairs an exemption to which she is entitled under the Texas exemption statutes as well as the cancellation of the lis pendens designation arising from that suit. In adversary proceeding 08-4033, the Plaintiff, Andra Group, seeks to determine whether the Defendant's entire discharge may be denied on the basis of a false oath when she failed to include the receipt of embezzled funds in 2005 in her Statement of Financial Affairs or, alternatively, whether the indebtedness alleged to be owed to the Plaintiff by the Defendant may be excepted from the scope of the Defendant-Debtor's discharge. The Plaintiff also filed an objection to the Defendant-Debtor's claim of exemption as to her homestead and to a particular term life insurance policy to the extent that it seeks to erase Andra's interest in those respective properties.

**Discussion**

The denial of a debtor's discharge is a harsh remedy and the provisions set forth in §727(a) are precisely drawn so as to encompass only those debtors who have not been honest and forthcoming about their affairs. *Buckeye Retirement Properties v. Tauber (In re Tauber)*, 349 B.R. 540, 545 (Bankr. N.D. Ind. 2006) ["The denial of a debtor's discharge is akin to financial capital punishment. It is reserved for the most egregious misconduct by a debtor."]. Thus, in order to accomplish that limited purpose, the provisions of §727(a) are to be construed liberally in favor of granting debtors the fresh start contemplated by the Bankruptcy Code and construed strictly against parties seeking to deny the granting of a debtor's discharge. *In re Ichinose*, 946 F.2d 1169, 1172 (5th

Cir. 1991); *Melancon v. Jones (In re Jones)*, 292 B.R. 555, 559 (Bankr. E.D. Tex. 2003). As the Plaintiff seeking such relief, the Plaintiff bears the burden of proving that the Debtor is not entitled to a discharge under §727. The standard of proof for its claim is a preponderance of the evidence. *See, e.g., Everspring Enter., Inc. v. Wang (In re Wang)*, 247 B.R. 211, 213-14 (Bankr. E.D. Tex. 2000) ("The standard of proof for allegations . . . under §727, is by a preponderance of the evidence.") (*citing Grogan v. Garner*, 498 U.S. 279 (1991) and *Mozeika v. Townsley (In re Townsley)*, 195 B.R. 54 (Bankr. E.D. Tex. 1996)).

Section 727(a)(4)(A) provides that:

> (a) The court shall grant the debtor a discharge, unless —
> (4) the debtor knowingly and fraudulently, in or in connection with the case—
> (A) made a false oath or account . . . .

The creditor, as the objecting party, carries the burden of proof and must show that (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement was material to the bankruptcy case. *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992).

Andra asserts that the Debtor should be denied a discharge under §727(a)(4)(A) because, on November 11, 2007, she answered "$12,475.00" in response to question #1 on her Statement of Financial Affairs which inquired about her gross income from employment in 2005 when, pursuant to Andra's allegations in this lawsuit, the Debtor had

allegedly embezzled an additional $150,000 from it in 2005. As of the time the Debtor's statements and schedules were filed, however, the allegations of embezzlement had been settled by the parties on the eve of trial in the state court and an agreed judgment had been entered without any finding of embezzlement against the Debtor. Notwithstanding this Court's ultimate decision in this case regarding embezzlement for the purposes of determining the dischargeability of that particular debt, Andra has failed to establish that, as of the time of the filing of the statements and schedules, the Debtor knew that her answer to that one particular question about her past income was false. Andra has further failed to demonstrate that the Debtor answered question #1 on November 11, 2007, with a fraudulent intent under circumstances in which an ongoing dispute over the validity of the agreed judgment existed and in which the Debtor would ultimately seek leave from this Court in the post-petition period to vacate that agreed judgment for lack of authority. Under those circumstances, Andra has failed to show that Ms. Ledbetter told an "intentional untruth." *In re Garcia*, 260 B.R. 622, 631 (Bankr. D. Conn. 2001). Finally, Andra has failed to show that the proffered answer was material. Though materiality is not determined solely upon value or upon the existence of a detrimental effect upon creditors, but rather whether it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property," *In re Duncan*, 562 F.3d 688, 695 (5th Cir. 2009), Andra has failed to make such a showing. Whatever amount of income might have been listed as having been received by the Debtor two years prior to the petition date

on the response to Question #1, it would have meant little, if anything, to the bankruptcy estate, and nothing was concealed by the answer because Andra's accusations against the Debtor had been of record for a significant time before the petition date, including accusations that the alleged funds had already been dissipated. While the honest disclosure of information remains essential for the proper working of the bankruptcy system, see *In re Darby*, 376 B.R. 534 (Bankr. E.D. Tex. 2007), section 727(a)(4)(A) is not intended to be utilized by creditors as a trap to compel a debtor into making judicial admissions or other concessions regarding contested litigation issues prior to trial. Accordingly, because Andra has failed to sustain its burden of proof to show that this Debtor's answer regarding her 2005 income in her Statement of Financial Affairs was intentionally false, was made with a fraudulent intent, and was material to the administration of the estate, the relief sought by the Plaintiff under §727(a)(4)(A) must be denied. Accordingly, the Court will issue an order of discharge for the Debtor.

*Effect of State Court Judgment*

Though the Debtor's discharge may not be denied in its entirety in this instance, it may still be determined that the particular debt owing to Andra should be excepted from the scope of any such discharge. In this regard, the Court must first examine the effect of the agreed judgment entered by the 193rd Judicial District Court in Dallas County based upon the settlement previously announced by the parties.

As an initial matter, the binding effect of the provisions of the amended judgment

and the possibility that the debt recognized therein could be held nondischargeable is not precluded because the agreed judgment was preceded by a settlement agreement. Though earlier decisions were divided as to whether the settlement of a debt based upon an accusation of fraud triggered the contractual doctrine of novation and transformed a fraud-based claim into a mere contractual breach,[18] the United States Supreme Court has now twice confirmed that the doctrine of novation does not operate to alter the nature of a debt for dischargeability purposes and that a bankruptcy court is not precluded on *res judicata* grounds from determining the nondischargeability of a fraud-based claim even though such a claim was settled prior to bankruptcy and such settlement did not contain a finding of fraud. See *Brown v. Felsen*, 442 U.S. 127 (1979) [parties settling suit by stipulation followed by entry of agreed judgment];[19] *Archer v. Warner*, 538 U.S. 314 (2003) [parties settling suit by settlement agreement only with release of all claims arising from the litigation except for payment of the settlement amount].[20]

---

[18] *Cf. Matter of West*, 22 F.3d 775 (7th Cir. 1994) and *Gonder v. Kelley*, 372 F.2d 94 (9th Cir. 1967) [applying novation doctrine]; with *Greenberg v Schools*, 711 F.2d 152 (11th Cir. 1983) and *U.S. v. Spicer*, 57 F.3d 1152 (D.C. Cir. 1995) [rejecting that approach].

[19] The *Brown* court held that res judicata was inapplicable because

> [D]efendant does not assert a new ground for recover, nor does he attack the validity of the prior judgment. Rather, what he is attempting to meet here is the new defense of bankruptcy which respondent has interposed between petitioner and the sum determined to be due him.

*Brown*, 442 U.S. at 133.

[20] The Supreme Court in *Archer* succinctly described the relevant circumstances as follows:

(1) A sues B seeking money that [A says] B obtained through fraud;
(2) the parties settle the lawsuit and release related claims;
(3) the settlement agreement does not resolve the issue of fraud, but provides that B will pay A a fixed sum;
(4) B does not pay the fixed sum;
(5) B enters bankruptcy; and

However, *Brown* and *Archer* do not stand for the proposition that a debt allegedly arising from wrongful conduct, and subsequently made the subject of a settlement agreement, becomes nondischargeable *ipso facto*. They simply permit a creditor, such as Andra in this case, to demonstrate that a debt recognized and quantified within the provisions of a settlement agreement (and perhaps thereafter memorialized in an agreed judgment) arises from circumstances that meet the requirements for nondischargeability under §523(a). Thus, it was appropriate for the parties to introduce evidence regarding the nature of the debt which was compromised by agreement to determine whether it falls within the parameters of §523(a) and, though *res judicata* does not preclude further inquiry into the true nature of a settled debt, the principles of collateral estoppel may still be applicable with regard to the establishment of those prerequisites necessary to a finding of nondischargeability.

"Collateral estoppel or, in modern usage, issue preclusion, 'means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'" *Schiro v. Farley*, 510 U.S. 222, 232 (1994) (*quoting Ashe v. Swenson*, 397 U.S. 436, 443(1970)); *see also* RESTATEMENT (SECOND) OF JUDGMENTS §27 (1982) ["When an issue of fact or law is actually litigated and determined by a valid final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent

(6) A claims that B's obligation to pay the fixed settlement sum is nondischargeable because, like the original debt, it is for "money . . . obtained by . . . fraud." *Archer*, 538 U.S. at 316-17.

action between the parties, whether on the same or different claim."]. The doctrine applies in bankruptcy dischargeability litigation, but a bankruptcy court retains exclusive jurisdiction to determine whether a debt is dischargeable. *Grogan v. Garner*, 498 U.S. 279, 285, n.11 (1991).

The inquiry into the preclusive effect of a state court judgment is guided by the full faith and credit statute.[21] Accordingly, federal courts look to the principles of issue preclusion utilized by the forum state in which a prior judgment was entered. Because the judgment against the Defendant was entered in a Texas state court, this Court therefore applies the Texas law of issue preclusion. *In re Pancake*, 106 F.3d 1242, 1244 (5th Cir. 1997); *In re Gober*, 100 F.3d 1195 (5th Cir. 1996).

Under Texas law, a party is collaterally estopped from raising an issue when: (1) the facts sought to be litigated in the second case were fully and fairly litigated in the first; (2) those facts were essential to the prior judgment; and (3) the parties were cast as adversaries in the first case. *Bonniwell v. Beech Aircraft Corp.*, 663 S.W.2d 816, 818 (Tex. 1984), *Cannon v. Texas Independent Bank*, 1 S.W.3d 218, 224 (Tex. App. – Texarkana 1999, pet. denied). Collateral estoppel principles apply under Texas law whether the issue is heard and determined through adjudication by a tribunal or is determined by the agreement of the parties. *Withers v. Republic Nat'l Bank*, 248 S.W.2d 271, 282 (Tex. Civ. App. – Beaumont 1951, writ ref'd n.r.e.); *Price v. Texas Employers'*

---

[21] The full faith and credit statute states that "judicial proceedings . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken." 28 U.S.C. §1738 (1994).

*Ins. Assn.*, 782 S.W.2d 938, 941 (Tex. App. – Tyler 1989, no writ).

Though both parties at trial before this Court had expressed agreement that collateral estoppel principles had no application in this matter, the application of those principles is a matter of law, not of agreement. Notwithstanding the fact that both parties expressed a desire to free themselves from the provisions of the agreed judgment reached between them in state court, neither possesses that particular prerogative.

The parties are each bound by the agreed judgment to the fullest extent. "A consent or agreed judgment is contractual in nature and in effect is a written agreement between the parties as well as an adjudication. It is as conclusive as any other judgment as to the matters adjudicated." *Wagner v. Warnasch*, 156 Tex. 334, 295 S.W.2d 890, 893 (1956), cited in *Avila v St. Luke's Lutheran Hosp*., 948 S.W.2d 841, 854 (Tex. App. – San Antonio 1997, pet. denied). Ms. Ledbetter claims that she is not bound by the agreed judgment because she never actually agreed to its terms. However, the agreement underlying the initial agreed judgment was announced on the record of the state court by an attorney employed by Ms. Ledbetter to represent her interests and who presumptively had the authority to express Ms. Ledbetter's consent to the agreement and to bind her to its terms. *Tex. Emp. Ins. Ass'n v. Wermske*, 162 Tex. 540, 349 S.W.2d 90, 93 (1961); *Eber v. First State Bank of Smithville*, 27 S.W.3d 287, 300 (Tex. App. – Austin 2000, pet. denied).

When Ms. Ledbetter first refused to sign the agreed judgment and Andra sought to compel its entry, the state court found that Ms. Ledbetter was bound by the agreement. It

entered judgment accordingly. It later confirmed that binding effect in the post-petition period when the Debtor sought and received a modification of the automatic stay for the stated purpose of seeking a reconsideration and reversal of the judgment based upon lack of authority. At the post-petition reconsideration hearing, the Defendant failed to introduce any evidence to support her contention that her attorney was without authority to enter into the settlement agreement with Andra, and thus, she was unable to overcome the presumption that her attorney was acting within the authority given by Ms. Ledbetter. *See Breceda v. Whi*, 187 S.W.3d 148, 152 (Tex. App. – El Paso 2006, no pet. h.); *Kelly v. Murphy*, 630 S.W.2d 759, 761 (Tex. App. – Houston [1st Dist.] 1982, writ ref'd n.r.e.); *Mid-South Towing Co. v. Har-Win, Inc.*, 733 F.2d 386, 390 (5th Cir. 1984) [". . . an attorney of record is presumed to have authority to compromise and settle litigation of his client, and a judgment entered upon an agreement by the attorney of record will be set aside only upon affirmative proof of the party seeking to vacate the judgment that the attorney had no right to consent to its entry"]. Thus, the state court affirmed the binding effect of the prior judgment upon the Defendant and clarified its earlier decision by issuance of the Amended Judgment on May 12, 2008. That Amended Judgment is binding upon Ms. Ledbetter in all respects and her attempt at avoidance by resurrecting yet again her twice-rejected challenge to the authority of her state court counsel cannot be countenanced.

The Amended Judgment is equally binding upon Andra. Though it has alleged, and may have suffered, damages in excess of $900,000, it elected to compromise its claim

against Ms. Ledbetter for $400,000 in damages and recognition of an equitable interest in the Debtor's homestead property valued at $54,036 as stated in the Amended Judgment. This Court will not look beyond the agreed judgment for legal determinations contained therein. The parties are each bound by the amount of the debt established by the judgment and they are bound by the imposition of the lien in the nature of a constructive trust in the designated amount. That is the extent to which collateral estoppel may properly apply here because the judgment is not supported by further factual findings. Thus, the Court now turns to consideration of those subsidiary facts necessary to determine the dischargeability of this established debt.[22]

*Nondischargeability Under §523(a)(4): Debt Arising from Fraud or Defalcation in a Fiduciary Capacity, Embezzlement or Larceny.*

The Plaintiff asserts that the debt owed to her by the Debtor should be excepted from discharge under 11 U.S.C. §523(a)(4).[23] The Fifth Circuit has noted "that this discharge exception was intended to reach those debts incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts; both classes of conduct involve debts arising from the debtor's acquisition or use of property that is not the debtor's." *Miller v. J.D. Abrams*

---

[22] In an action to determine the dischargeability of a debt, the creditor has the burden of proof under a preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

[23] 11 U.S.C. §523(a)(4) states that:

> (a) A discharge under Section 727 . . . of this title does not discharge an individual debtor from any debt . . .
> > (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

*Inc. (Matter of Miller),* 156 F.3d 598, 602 (5th Cir.1998), *cert. denied,* 526 U.S. 1016 (1999) (internal quotations omitted).

"Embezzlement is defined for the purposes of §523(a)(4) as the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come."[24] *Id.* "Embezzlement, however, is not limited to situations in which one person is entrusted with the property of another. It also applies where . . . a person lawfully obtains property, but then fraudulently appropriates it for his or her own use." *Powers v. Caremark, Inc. (In re Powers),* 261 Fed. Appx. 719, 2008 WL 104272, at *4 (5th Cir. 2008). "Given that a debtor has lawful control of the property, embezzlement then requires three elements: (1) appropriation of funds by the debtor; (2) for the debtor's use or benefit; and (3) with fraudulent intent." *Rainey v. Davenport (In re Davenport),* 353 B.R. 150, 200 (Bankr. S.D. Tex. 2006). Fraudulent intent is "an intent to deceive another person and thereby induce such other person to transfer, alter or terminate a right with respect to property." *Winn v. Holdaway (In re Holdaway),* 388 B.R. 767, 778 (Bankr. S.D. Tex. 2008). "Fraudulent intent may be inferred from the conduct of the Debtor and from circumstances of the situation." *Int'l Beauty Products, LLC v. Beveridge (In re Beveridge),* 2009 WL 2591143, at *10 (Bankr. N.D. Tex. Aug. 18, 2009) (citations omitted).

---

[24] "Both larceny and embezzlement involve the fraudulent appropriation of property; they differ only in timing. Larceny applies when a debtor unlawfully appropriates property at the outset, whereas embezzlement applies when a debtor unlawfully appropriates property after it has been entrusted to the Debtor's care." *Rainey v. Davenport (In re Davenport),* 353 B.R. 150, 199 (Bankr. S.D. Tex. 2006).

Andra presented both direct and circumstantial evidence to support the proposition that the Debtor was responsible for the misappropriation of more than $900,000 during her tenure at the company. The Debtor had direct control over the production of checks and the process by which they could be distributed. She had primary access to the accounting system with virtually no day-to-day supervision of her activities within the system. It can reasonably be said that Ms. Edmark focused upon entrepreneurial projects and often gave insufficient attention to day-to-day financial operations and the monthly financial compilations.[25] There is direct and compelling evidence that, except for the forged signature of Ms. Edmark, the Debtor was fully responsible for all steps leading to the misappropriation of the $11,580.83 disguised as a vendor payment to La Mystere and thereafter converted such funds to her own personal use after depositing the illegitimate check into her bank account. Upon this discovery in the Peachtree internal auditing log and the accusations against her that invariably followed, one might have expected that an innocent person with primary responsibility over the bookkeeping functions of a company for almost five years would have quickly sought an explanation about the missing funds and have sought assurance that the incident had been an isolated aberration.

Instead, the Debtor almost immediately resigned her position and quickly refused

[25] As thousands of dollars flew out Andra's doors in the guise of vendor payments, Ms. Edmark testified that she kept noticing that inventory costs from vendors was surprisingly high but, though such facts undoubtedly hindered the overall economic performance of the company, she never investigated those inflated costs until the credit union raised a red flag regarding the validity of the signature on a vendor check. The outside accountant was obviously more focused upon creating financial reports than verifying the accuracy of the transactions reflected in those reports.

to provide any cooperation at all to the investigation of the incident. It was subsequently determined — without the Debtor's help — that the problem was far greater in scope and duration and that virtually all of the illegitimate entries subsequently discovered in the company's ledger over the 4½ year-period shared the same methodology as the unauthorized La Mystere payment. The Debtor soon closed the personal bank account through which the one illicit transaction was processed and that of her dependent son as well. It is only through the Plaintiff's determined efforts that the inexplicable sums of money flowing through the Defendant's bank accounts during the exact same period were revealed and that they generally match the aggregate amount of funds missing from the Plaintiff's till.

Meanwhile, the Debtor's only response is that the embezzlements never occurred, although she refused to assist in investigation of the problem and makes no effort to offer a plausible explanation for the circumstances. While it is true that the Plaintiff offered no direct proof that Ms. Ledbetter actually perpetrated the forgeries of Ms. Edmark's signature, the Debtor did nothing to identify the source of the forgeries (other than denying them) and she only outlined some financial discrepancies within the company's operations (which she would obviously know) but nothing that explains or neutralizes the impropriety of the various transactions reflected in the Peachtree system.[26] Most tellingly, the Debtor made absolutely no effort to explain the extraordinary amount of

[26] Ms. Ledbetter half-heartedly accused Ms. Edmark of changing legitimately recorded payments to Second Office for purposes of revenge. However, there is no tangible evidence that Edmark manipulated data in the Peachtree system, nor even that she had the capability of doing so.

money flowing through her bank accounts. There was no oral explanation. There was no written documentation presented to exonerate herself, such as proof of additional sources of substantial income from third parties. She was a bookkeeper who apparently would have everyone believe that she did not keep receipts and other verifications for her own business enterprise. There is basically just a general denial by the Debtor with a few allegations regarding the unreliability of the Peachtree accounting system and other diversionary explanations. However, there is little, if anything, tangible by which a reasonable inference of misappropriation of funds by the Debtor can be refuted. And, of course, there is whatever inference is to be properly drawn from the fact that she settled the civil litigation over these accusations by agreeing to pay $400,000 and accepting the imposition of an equitable lien upon her homestead.

All of these circumstances convince the Court that Ms. Ledbetter was indeed responsible for the fraudulent appropriation of Andra's funds for her own personal use and that the debt owing to Andra arising from the agreed judgment should be rendered nondischargeable as an embezzlement under §523(a)(4). There is compelling proof of a misappropriation of funds from Andra by the Debtor. There is compelling proof that the Debtor deposited significantly more money derived from Andra accounts than is reflected in her company's salary payments and that she enjoyed access to an income stream and an amount of disposable income over the same time period which far exceeded that which could be expected from an approximate annual salary of $40,000. The cash flow through her accounts did not derive from expense reimbursements. The Debtor has offered no

reasonable explanation to counter a conclusion that she absconded with the missing Andra funds and utilized them for her own personal benefit. As for fraudulent intent, it has been said that "since fraud thrives in the shadows, a debtor who acts openly, without any attempt at concealment, and whose actions can be clearly seen, can negate fraudulent intent."[27] The Debtor's conduct in this instance has evidenced precisely the opposite. Her response to the crisis in general, her secrecy regarding the significant income she enjoyed, and the fact that she made no attempt to offer a plausible alternative to her liability convinces the Court that she exercised control over the payments, disguised them so that they would not be detected in the Andra accounting system, and routed them eventually to her bank account — robbing Andra of their use while treating herself and her relatives to a lifestyle that they could not otherwise afford. Therefore, the Court finds that the Debtor's acquisition and use of Andra's funds was performed with a fraudulent intent and that such usage constitutes an embezzlement of those funds. Accordingly, the Court concludes that the $400,000 debt owed to Andra Group, L.P. by the Debtor as reflected in the agreed judgment is thereby rendered nondischargeable under 11 U.S.C. §523(a)(4).

*Nondischargeability Under §523(a)(6):*
*Debt Arising from Willful and Malicious Injury*

The Plaintiff's Complaint also seeks a determination that the debt which it alleges

[27] *Davenport*, 353 B.R. at 200.

arises from the misappropriation of assets by the Defendant should be excepted from discharge as a debt arising from a willful and malicious injury inflicted by the Debtor-Defendant. Section 523(a)(6) of the Bankruptcy Code provides that:

> (a) A discharge under Section 727 . . . of this title does not discharge an individual debtor from any debt . . .
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

The United States Supreme Court has reexamined in recent years whether the scope of §523(a)(6) encompasses all intentional acts that cause injury, or only acts done with an actual intent to cause injury. In *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), the Court held that, in order for liability under §523(a)(6) to attach, an actor must inflict a deliberate or intentional injury, not merely take a deliberate or intentional act that leads to injury. In seeking to articulate a methodology by which to distinguish between acts intended to cause injury as opposed to those merely leading to injury, the Fifth Circuit subsequently determined that, in determining whether a debt is nondischargeable under §523(a)(6), an injury is "willful and malicious" where there is either (1) an objective substantial certainty of harm arising from a deliberate or intentional action or (2) a subjective motive to cause harm by a party taking a deliberate or intentional action. *Matter of Miller*, 156 F.3d 598, 604-06 (5th Cir. 1998), *cert. denied, Miller v. J.D. Abrams, Inc.*, 526 U.S. 1016 (1999).[28] "Injuries covered by section 523(a)(6) are not

---

[28] The Circuit further determined in *Miller* that the standard for determining the existence of a "willful" injury under *Geiger* had subsumed the Circuit's former standard for determining "malicious"

limited to physical damage or destruction; harm to personal or property rights is also covered by section 523(a)(6). Willful conversion of another's property falls within section 523(a)(6)." *Beveridge*, 2009 WL 2591143, at *11.

The Court finds that the Debtor's act of surreptitiously appropriating Andra's funds without the knowledge of its principal and diverting it to her own personal use was a deliberate and intentional act by the Debtor. The evidence clearly supports a finding that the Debtor's multiple acts of misappropriation of Andra's funds for her own personal use were objectively and substantially certain to cause harm to Andra. The amount of the diverted funds alone is sufficient to meet that criteria. The Court further finds that the Debtor's actions did inflict harm upon the Andra Group through the loss of more than $900,000 over a 4½-year period. The Debtor's conversion of these funds was not an innocent, technical conversion. It was a planned, controlled exercise of dominion and control over another's money perpetrated over a series of years which funded a lifestyle for the Defendant and her family that they could not have otherwise afforded. Of course, the state court judgment and the estoppel arising from that judgment, as previously outlined, affect the amount of the debt which the Plaintiff can legitimately claim in this regard. Accordingly, the Court concludes that the $400,000 debt owed to Andra Group, L.P. by the Debtor as reflected in the agreed judgment is also rendered nondischargeable

conduct under §523(a)(6) ["without just cause or excuse"] and had eliminated any need to conduct a separate analysis on that malice element. *Id*. at 604-06.

as the infliction of a willful and malicious injury under 11 U.S.C. §523(a)(6).[29]

*Complaint to Avoid Lien and Objection to Exemption*

Finally, the Court considers the Debtor's "Second Amended Complaint to Avoid Lis Pendens and Judgment Lien as to Homestead." Though styled as a complaint, it essentially seeks to invoke the provisions of §522(f) "to avoid the fixing of a purported lien . . . to the extent that such purported lien impairs an exemption to which Ruth Ann Gamble-Ledbetter would have been entitled under Texas exemption laws, because said lien is a judicial lien and/or because as Title 11, U.S.C. §524(a)(1) states: a discharge "voids any judgment at any time obtained. . . ."[30] Conversely, Andra challenges the legitimacy of the exemption claims made by Ms. Ledbetter to the extent that they threaten the viability of the equitable lien imposed upon the Debtor's homestead by the Agreed Judgment or seek to protect the proceeds of the life insurance policy that the Debtor had agreed to maintain and turnover to Andra and that was incorporated into the terms of the Agreed Judgment.

11 U.S.C. §522(f)(1)[31] allows a debtor to avoid a lien on exempt property if that

---

[29] Having concluded that the debt owed by the Debtor to Andra Group, L.P. is nondischargeable under the alternate grounds of §523(a)(4) and §523(a)(6), the Court believes that it is unnecessary to address the Plaintiff's allegations under §523(a)(2)(A).

[30] Ruth Ann Gamble-Ledbetter's Second Amended Complaint at pp. 1-2.

[31] Section 522(f)(1) of the Bankruptcy Code states in relevant part:

> Notwithstanding any waiver of exemptions, but subject to paragraph (3), the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection

debtor can show that "(1) the lien is a judicial lien; (2) the lien is fixed against an interest of the debtor in property; (3) and the lien impairs an exemption to which the debtor would otherwise be entitled." *See In re Bensen*, 262 B.R. 371, 379 (Bankr. N.D. Tex. 2001) (*citing Matter of Henderson*, 18 F.3d 1305 (5th Cir.1994) *and In re Inman,* 131 B.R. 789, 791 (Bankr. N.D. Tex. 1991)). While there is little dispute that the referenced equitable lien is a "judicial lien,"[32] and that the lien was fixed, at least in a technical sense, against the Debtor's interest by agreement and through the provisions of the Agreed Judgment, the Court finds that the Debtor has failed to prove the third element in this triad. In the consolidated presentation of evidence, Andra has demonstrated that the Debtor issued payments exceeding $54,000 from the commingled funds in her bank account to her mortgage holder, First Horizon Home Loans, in the 4½-year period between November 2000 and June 2005 when the Debtor's misappropriation of funds was discovered. In recognition of this fact, the Debtor agreed to the imposition of an equitable lien on her homestead in The Colony in favor of Andra in the amount of $54,036. That lien was thereafter imposed by both versions of the Agreed Judgment. Setting aside the issue of whether the lien could be considered consensual in nature due to the agreement between

---

(b) of this section, if such lien is —

(A) a judicial lien . . . .

[32] The Court notes that the equitable lien awarded in the Amended Judgment clearly constitutes a "judicial lien" under 11 U.S.C. §101(36), which defines the term "judicial lien" as a "lien obtained by judgment, levy, sequestration, or other legal or equitable process or proceeding."

the parties,[33] it is certainly true that the imposition of the equitable lien under these circumstances simply recognizes the superior equitable title which vested in Andra under Texas law when its money was fraudulently used by the Debtor to pay for a portion of her home mortgage and it does not constitute an improper impairment of any exemption right of the Debtor. As explained in *Owen v. Owen*, 500 U.S. 305 (1991):

> . . . if a debtor holds only bare legal title to his house-if, for example, the house is subject to a purchase-money mortgage for its full value-then only that legal interest passes to the estate; the equitable interest remains with the mortgage holder. . . . And since the equitable interest does not pass to the estate, neither can it pass to the debtor as an exempt interest in property. Legal title will pass, and can be the subject of an exemption; but the property will remain subject to the lien interest of the mortgage holder.

*Id*. at 308-09.

This same situation was recently addressed by Judge Rhoades in *In re Huie*, 2007 WL 2317152 (Bankr. E.D. Tex. 2007) in which the debtors were found to have used fraudulently obtained funds to pay a portion of the purchase price on their home. The Court concluded in that case that:

> [T]he Debtors, therefore, "took and held the legal title ... in trust for [the Plaintiff], in [whom] the superior equitable title vested" to the extent the Debtors used the fraudulently [obtained] (sic) funds to pay for the Home. *First State Bank of Ellinger v. Zelesky*, 262 S.W. 190, 192 (Tex. Civ. App.–

---

[33] Texas jurisprudence establishes, however, that the agreed judgment is contractual in nature and constitutes an express agreement between the parties that stands as an additional foundation that supports the creation of the equitable lien against the Debtor's homestead. *See Blankenship v. Wightman*, 2006 WL 1865635, at *2 (Tex. App.– Texarkana 2006, no pet. h.).

Galveston 1924, no writ). *See also Maryland Casualty Co. v. Schroeder*, 446 S.W.2d 117, 121 (Tex. Civ. App.– El Paso 1969, writ ref 'd n.r.e.) [a homestead cannot be a "haven for wrongfully obtained money or properties" because such property does not belong to the wrongdoer] (quoting *Baucum v. Texam Oil Corp*., 423 S.W.2d 434, 442 (Tex. Civ. App.– El Paso 1967, writ ref' d n.r.e.)); *Smith v. Green*, 243 S.W. 1006, 1007-08 (Tex. Civ. App.– Amarillo 1922, writ ref'd) [plaintiff, a victim of fraud, could recover fraudulently obtained funds used for improvements to a home from the home's sale proceeds because the plaintiff at all times retained title to the funds]. The judicial lien imposed by the State Court Judgment did not fix on an interest of the Debtors in the Home inasmuch as it was based on the Debtors' use of fraudulently obtained funds to purchase the Home. Rather, the judicial lien recognized, and was co-extensive with, the [Plaintiff's] existing equitable interest in the Home.

Moreover, with respect to the second element necessary to avoid a judicial lien, the Debtors would not have been entitled to exempt the Home from the [Plaintiffs'] claim for the fraudulently obtained funds. See *Baucum*, 423 S.W.2d at 442 ["It has long been decided that homestead and exemption laws of this State were never intended to be, and cannot be, the haven of wrongfully obtained money or property"]; *Zelesky*, 262 S.W. at 192 [property purchased with wrongfully obtained funds never becomes the property of the wrongdoer); *Smith*, 243 S.W. at 1007-08 [title to wrongfully obtained funds never passes to wrongdoer]. *Under Texas law, the [Plaintiffs] hold equitable title to the Home up to the amount of the fraudulently obtained funds. . . . Texas law does not permit the Debtors to use their homestead exemption to shield the Home from the [Plaintiff's] superior equitable interest in the Home*. . . . Accordingly, the Debtors may not use §522(f)(1)(A) of the Bankruptcy Code to invalidate the [Plaintiff's] lien on the Home in the amount of the fraudulently obtained funds. See *Owen*, 500 U.S. at 310-11.

*Id*. at *5 (emphasis added). The same rule applies in this case. The equitable lien imposed by the Agreed Judgment fulfills the function of another equitable remedy requested by Andra — the constructive trust — by recognizing that Andra's equitable interest in the Home is superior to the Debtor's bare legal title and it negates the need for the additional remedy. Indeed the equitable lien is a superior remedy to the constructive trust in this instance because the enforcement of it would be an *in rem* action that is outside the scope of the discharge injunction issued under §524. *In re Gallo*, 573 F.3d 433, 438 n.6 (7th Cir. 2009); *Young v. Wells Fargo Bank (In re Young)*, 2007 WL 1159952, at *2 (Bankr. S.D. Tex. Apr. 16, 2007) *Wofford v. Scott (In re Scott)*, 347 B.R. 917, 919-20 (Bankr. M.D. Fla. 2006). Because the Debtor utilized fraudulently-obtained funds as a means to reduce the indebtedness on her homestead, the superior equitable interest of Andra in the Debtor's home, as quantified in the Agreed Judgment,[34] cannot be avoided or invalidated by the Debtor through the use of §522(f) or any other device. As one Texas appellate court has stated,

> [T]he homestead protection afforded by the Texas Constitution was never intended to protect stolen funds. Stolen funds used for the purchase of a homestead or improvement of an existing homestead can never acquire homestead rights as they are held in trust for the rightful owners of the funds.

*Bransom v. Standard Hardware*, 874 S.W.2d 919, 928 (Tex. App.– Fort Worth 1994, writ

---

[34] Since it was a component of the agreement between the parties that was incorporated into the Agreed Judgment, the equitable lien may also be protected from collateral attack due to the principles of res judicata. *See In re Wimberly*, 355 B.R. 596 (Bankr. S.D. Tex. 2006), *aff'd*, 2007 WL 2537584 (S.D. Tex. 2007)

denied) (citations omitted). Accordingly, the relief sought in the Debtor's Second Amended Complaint must be denied in its entirety. Correspondingly, Andra's objection to the Debtor's claim of exemption must be sustained with regard to the homestead claim of the Debtor, Ruth Ann Gamble-Ledbetter, and that the Debtor's claim of a homestead exemption as to 4507 North Horseshoe Trail, The Colony, Denton County, TX 75056, is subordinated and subject to the equitable lien awarded to Andra Group, L.P. in the original principal amount of $54,036.00 in that certain Amended Judgment issued on May 12, 2008, in favor of Andra Group, L.P. and against said Debtor by the 193rd Judicial District Court in and for Dallas County Texas, in case no. 05-9749-L.

As for Andra's objection to the Debtor's claim of exemption regarding the Liberty Life insurance policy under TEX. INS. CODE §1108.051, *et. seq.*, the Court concludes that such objection must also be sustained. Although the party objecting to a claimed exemption has the ultimate burden of persuasion (or the risk of non-persuasion) pursuant to FED. R. BANKR. P. 4003(c), the debtor-claimant must sustain an initial burden of production or going forward with the evidence to establish that the referenced property qualifies for the exemption claimed before the objecting party is obligated to go forward with his proof. The parties presented only limited evidence on this point. However, such evidence shows that the Debtor surrendered her ownership interest in the policy to Andra pursuant to the settlement reached by the parties which was later incorporated into the

Agreed Judgment.[35] The Court can only surmise that this was effectively an admission that commingled funds had been utilized to purchase premiums on the policy or that it was an agreed vehicle by which the Debtor could ultimately supply a repayment of the misappropriated funds.[36] The surrender of an otherwise exempt asset would be consistent with the recognition that any exemption right available under §1108.051 [or its predecessor Art. 21.22] that might otherwise exist as to an insurance policy is forfeited in the event of fraud. See TEX. INS. CODE §1108.53; see also, *Sun Life Assurance Co. of Canada v. Dunn*, 134 F.Supp.2d 827, 836 (S.D. Tex. 2006) [finding that the victims of an embezzlement had an ownership interest in the portion of the policy purchased with embezzled funds]. In any event, the Court need not speculate as to the motivation. It is axiomatic that an individual may not exempt a property interest that she does not own. The evidence establishes that Andra has an ownership interest in that policy through the Agreed Judgment and the Debtor offered no other basis for exemption of the policy. Accordingly, the Court finds that the Debtor has failed to sustain her burden to show that the referenced life insurance policy qualifies for the exemption claimed and Andra's objection to the claim of exemption as to the Liberty Life policy is sustained.

---

[35] The Agreed Judgment stated in relevant part:

> [It is further] ORDERED, ADJUDGED AND DECREED that, pursuant to Civ. Prac. & Rem. Code section 31.002, et. seq., Plaintiff have a turnover order on life insurance policy no. 0010001721 issued by Liberty Life Insurance Co., such that any proceeds paid on this insurance policy are to be paid solely to Plaintiff [Andra], or a person or entity designated by Plaintiff.

[36] The suspicion of an agreement is based upon the fact that §31.002 of the Civil Practice and Remedies Code could not otherwise be used in this manner since subdivision (f) of that statute specifies that "[a] court may not enter or enforce an order under this section that requires the turnover of the proceeds of, or the disbursement of, property exempt under any statute."

## Conclusion

The Court therefore concludes that the Debtor-Defendant, Ruth Ann Gamble-Ledbetter, is entitled to the entry of a discharge order pursuant to 11 U.S.C. §727(a). However, the debt in the original amount of $400,000.00, plus post-judgment interest and court costs, owed by the Defendant, Ruth Ann Gamble-Ledbetter, to the Plaintiff, Andra Group, L.P., arising from the entry of that certain Amended Judgment on May 12, 2008, by the 193rd Judicial District Court of Dallas County, Texas in cause no. 05-09749-L, and styled *Andra Group, Inc. v. Ruth Ann Ledbetter, individually and d/b/a 2nd Office and 2nd Office, Inc., et al.*, is hereby determined to be nondischargeable pursuant to 11 U.S.C. §523(a)(4) and §523(a)(6). All other relief requested by Andra Group, L.P. in its adversary complaint is denied.

The relief requested in the adversary complaint filed by Ruth Ann Gamble-Ledbetter, in her capacity as the plaintiff in adversary proceeding no. 08-4031, is denied.

Finally, as to the related contested matter, the Objection to Debtor's Claim of Exemptions filed by Andra Group, L.P. is sustained and that the claim of a homestead exemption by the Debtor, Ruth Ann Gamble-Ledbetter, as to Lot 34, Block 10, Garza - Little Elm Lake Estates, an addition of the City of The Colony, Denton County, Texas, according to the plat thereof recorded in Volume 2, Page 80 of the Plat Records of Denton County, Texas, more commonly described as 4507 North Horseshoe Trail, The Colony, Denton County, TX 75056, is hereby declared subordinated and subject to the equitable lien awarded to Andra Group, L.P. in the original principal amount of

$54,036.00 in that certain Amended Judgment issued on May 12, 2008, in favor of Andra Group, L.P. and against said Debtor by the 193rd Judicial District Court in and for Dallas County Texas, in case no. 05-9749-L.

As to the Debtor's claim of exemption under Texas Insurance Code §1108.051 regarding life insurance policy no. 0010001721 issued by the Liberty Life Insurance Company, the Andra Group's objection is sustained, and the Debtor's claim of exemption as to that policy is denied.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law[37] pursuant to Fed. R. Civ. P. 52, as incorporated into adversary proceedings in bankruptcy cases by Fed. R. Bankr. P. 7052. Appropriate judgments shall be entered in each adversary proceeding and an appropriate order shall be entered in the related contested matter which are consistent with this opinion.

Signed on 10/27/2009

THE HONORABLE BILL PARKER
CHIEF UNITED STATES BANKRUPTCY JUDGE

---

[37] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The Court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.